## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JULIE GORENC, KARA WINKLER, and MIDWIFE PARTNERS IN WOMEN'S WELLNESS, LLC, | |
| Plaintiffs, | |
| v. | Case No. 18-2403-DDC-JPO |
| JANETTA PROVERBS, M.D., | |
| Defendant. | |

## MEMORANDUM AND ORDER

Before the court is defendant Janetta Proverbs, M.D.'s Motion for Judgment on the Pleadings (Doc. 39). Plaintiffs Julie Gorenc, Kara Winker, and Midwife Partners in Women's Wellness, LLC have filed a Response (Doc. 42). Defendant never filed a Reply and the time to do so has expired. For reasons explained below, the court grants defendant's Motion for Judgment on the Pleadings.

## I.  Factual Background

The court takes the following facts from plaintiffs' Complaint (Doc. 1) and views them in the light most favorable to plaintiffs. *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (explaining that the court must "accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the [plaintiff]" (citation and internal quotation marks omitted)).

Julie Gorenc and Kara Winkler are certified nurse-midwives holding active advance practice registered nurse ("APRN") licenses issued by the Kansas State Board of Nursing

("KSBN").[1]  Doc. 1 at 3 (Compl. ¶¶ 7–8).  Ms. Gorenc and Ms. Winkler practice through Midwife Partners in Women's Wellness, LLC, a Kansas limited liability company ("Midwife Partners in Women's Wellness," and together with Ms. Gorenc and Ms. Winkler, "plaintiffs"). *Id.* (Compl. ¶ 9).

KSBN and Adventist Health Mid-America, Inc. ("Adventist") required plaintiffs to have a collaborative practice agreement (a "CPA") with a private physician as a condition to attending births at Shawnee Mission Medical Center Health ("SMMCH"), a hospital owned and operated by Adventist.  *Id.* at 4–5 (Compl. ¶¶ 12, 22).  Sometime in 2016, plaintiffs entered into a CPA with defendant, permitting plaintiffs delivery privileges at SMMCH.  *Id.* (Compl. ¶¶ 21–25). Defendant informed plaintiffs that she would terminate the CPA, effective February 2018.  *Id.* (Compl. ¶¶ 23–25).  Plaintiffs sought CPAs with other OB/GYNs employed at SMMCH without avail.[2]  *Id.* at 5–6 (Compl. ¶¶ 26–30).  Without a CPA with a physician employed or holding privileges at SMMCH, plaintiffs could not attend the deliveries of their clients at SMMCH, causing clients to leave plaintiffs' practice.  *Id.* at 6 (Compl. ¶¶ 33–34).

By terminating the CPA, plaintiffs allege that defendant Dr. Janetta Proverbs has:  (1) "deprived [p]laintiffs of their liberty and property interests in contracting and practicing in their chosen profession without due process of law," (2) "interfered with [p]laintiffs' contracts with current clients," and (3) "interfered with [p]laintiffs' business expectancies."  Doc. 1 at 2 (Compl. ¶ 35); *see also id.* at 5–6, 15–17, 23, 24 (Compl. ¶¶ 17–18, 35, 87, 92–94, 129, 139) (alleging a property and liberty interest in "practicing [in] their chosen profession free from

---

[1]    JoAnn Klaassen in her official capacity as the President of KSBN also was named as a defendant in this case.  But the court granted her Motion to Dismiss and terminated JoAnn Klaassen, RN, MN, JD as a defendant on September 30, 2019.  *See* Doc. 38.

[2]    Adventist and these OB/GYNs also were named as defendants in this case.  But the court granted their Motion to Dismiss and terminated their status as defendants on August 1, 2019.  *See* Doc. 35.

unreasonable restraint," "a liberty interest in entering private contracts," impairment of plaintiffs' "freedom to contract," and damage to plaintiffs' reputation). So, plaintiffs assert a 42 U.S.C. § 1983 claim against defendant, arguing that she "knowingly, willfully[,] and maliciously deprived [p]laintiffs of their liberty and property interests in practicing their chosen profession and their freedom to contract" without due process, violating plaintiffs' Fourteenth Amendment rights (Count III). *Id.* at 5, 23, 24 (Compl. ¶¶ 17, 129, 139). Plaintiffs also assert two state law claims against defendant: (1) tortious interference with plaintiffs' contracts with their clients (Count IV) and (2) tortious interference with a business expectancy (Count V), *i.e.*, plaintiffs expected they would continue to have admitting privileges at SMMCH, the growth of their practice was tied to this privilege, and defendant interfered with this privilege, halting their expected business growth. *Id.* at 25–28 (Compl. ¶¶ 143–165). Defendant moves for judgment on the pleadings for all claims against her under Fed. R. Civ. P. 12(c).

## II.       Legal Standard

Fed. R. Civ. P. 12(c) provides "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." "A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6)." *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000). So, the legal standards that apply to Rule 12(b)(6) motions also apply to a Rule 12(c) motion.

Under Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. When considering a motion to dismiss for failure to state a claim upon which relief can be granted, the court must assume that the factual allegations in the complaint are true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But this requirement does not extend to every assertion made in a complaint. The court is "'not bound to accept as true a

legal conclusion couched as a factual allegation.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice'" to state a claim for relief.  *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (quoting *Ashcroft*, 556 U.S. at 678).  Also, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555 (citations omitted).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1192 (10th Cir. 2009) ("The question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." (citation omitted)).  Essentially, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."  *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  This plausibility standard reflects the requirement in Fed. R. Civ. P. 8 that pleadings must provide defendants with fair notice of the nature of the claims as well as the grounds upon which each claim rests.  *See Khalik v. United Air Lines*, 671 F.3d 1188, 1191–92 (10th Cir. 2012); *see also* Fed. R. Civ. P. 8(a)(1) (providing a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief"); *Ashcroft*, 556

U.S. at 678 (explaining Rule 8 "does not require 'detailed factual allegations,' but it demands more than . . . [a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, "'will not do'" (quoting *Twombly*, 550 U.S. at 555)).

## III.      Analysis

Defendant Dr. Janetta Proverbs asserts three main arguments why plaintiffs' federal law claim under 42 U.S.C. § 1983 fails to state a claim upon which relief can be granted:  (1) she is not a state actor; (2) even if the court concludes defendant is a state actor, she is entitled to qualified immunity; and (3) plaintiffs have not been deprived of any constitutionally protected right or property interest.  Defendant also argues that, if the court dismisses the federal law claim against defendant, it should decline to exercise jurisdiction over the state law claims plaintiffs have asserted against her.  Alternatively, defendant argues, plaintiffs have failed to state plausible tortious interference with contracts and tortious interference with a business expectancy claims.

As explained below, the court considers only defendant's state actor argument.  Because the court concludes plaintiffs cannot advance a 42 U.S.C. § 1983 claim against defendant because she is not a state actor, the court need not consider defendant's remaining arguments for judgment on the pleadings against plaintiffs' §1983 claim.  And, without any federal law claims surviving defendant's Motion for Judgment on the Pleadings, the court declines supplemental jurisdiction over plaintiffs' state law claims against defendant.

### A.      42 U.S.C. § 1983 Claim

A defendant is liable under 42 U.S.C. §1983 if, acting under color of state law, she deprives a plaintiff of "'any rights, privileges, or immunities secured by the Constitution . . . .'" *Marin v. King*, 720 F. App'x 923, 934 (10th Cir. 2018) (quoting 42 U.S.C. § 1893).  To state a

5

viable § 1983 claim upon which relief may be granted, plaintiffs must allege that: (1) they have been deprived of a federally protected right and (2) "the person who has deprived [them] of that right acted under color of state or territorial law." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (citations omitted); *see also Wittner v. Banner Health*, 720 F.3d 770, 773 (10th Cir. 2013) (reciting elements for § 1983 claim).

Defendant argues plaintiffs cannot establish either element—(1) deprivation of any constitutionally protected right or (2) that defendant is a state actor (*i.e.*, that defendant acted under color of state law and is subject to suit under § 1983). Failing to allege facts capable of sustaining either element dooms a § 1983 claim. *See Johnson v. Rodrigues*, 293 F.3d 1196, 1202 (10th Cir. 2002) (describing two-part test for evaluating § 1983 claim). And a court, when resolving a dispositive motion, need not determine if plaintiffs were deprived of a recognized right before it evaluates whether the alleged deprivation occurred by a state actor under color of state law. *See id.* (assuming plaintiff had satisfied the first element and focusing analysis on whether defendants were state actors); *see also Wittner*, 720 F.3d at 780–81 (explaining the court "need not decide whether a Constitutional right . . . existed or was clearly established" because the defendants were not state actors). Here, the court elects to address the state actor question, first.

## 1. Private Individuals as State Actors

"'The traditional definition of acting under color of state law requires that the defendant in a [42 U.S.C. § 1983] action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Marin*, 720 F. App'x at 934 (alteration in original) (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)). To be liable, a defendant must "'fairly be said to be a state actor.'" *Johnson*, 293 F.3d at 1202 (quoting

*Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982)).  A person may be a state actor because she is a state official.  *Id.*  Or, a person fairly may be considered a state actor because she "'has acted together with or obtained significant aid from state officials, or because [her] conduct is otherwise chargeable to the State.'"  *Id.* (quoting *Lugar*, 457 U.S. at 937).  So, a private individual not employed by the state may be deemed a state actor in certain circumstances.  *See id.*; *see also Marin*, 720 F. App'x at 934 ("Liability under § 1983 can extend beyond officers employed by the state as 'private persons, jointly engaged with state officials in the prohibited action, are acting "under color" of law for purposes of § 1983.'" (brackets omitted) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970))).  To determine if a plausible § 1983 claim has been alleged against a defendant, the court focuses on the allegations directed at that defendant specifically.  *Robbins v. Oklahoma*, 519 F.3d 1242, 1251 (10th Cir. 2008) ("In general, state actors may only be held liable under § 1983 for their own acts, not the acts of third parties." (citing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989))).  So, plaintiffs' Complaint must "make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state."  *Id.* at 1250 (citing *Twombly*, 550 U.S. at 564 n.10).

The Tenth Circuit has identified four tests that help district courts determine whether a private party is deemed a state actor in the context of a § 1983 claim.  They are:  "(1) the public function test, (2) the nexus test, (3) the symbiotic relationship test and (4) the joint action test."  *Johnson*, 293 F.3d at 1202 (citing *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995)).  Under each test, "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'"  *Gallaher*, 49 F.3d at 1446–47 (quoting

*Lugar*, 457 U.S. at 937) (explaining the Fourteenth Amendment and 42 U.S.C. §1983 prohibit states and state actors acting under color of law from depriving any person of their life, liberty, or property without due process of law, but these prohibitions apply only to governmental action, not private conduct).

Defendant contends the Complaint alleges just one action by defendant that deprived plaintiffs of their constitutionally protected rights: her decision to terminate the CPA.  Doc. 40 at 5–6.  And, defendant argues, only the public function test and symbiotic relationship test are relevant here and defendant is not a state actor under either test.  *Id.* at 5.  Plaintiffs respond, arguing only that the public function test applies.  As a result, the court addresses the parties' arguments under that test alone.  *See* Doc. 42 at 3–6.[3]

## 2.  The Public Function Test

"The public function test consists of determining whether the state has delegated to a private party 'a function traditionally *exclusively* reserved to the States.'"  *Johnson*, 293 F.3d at 1203 (emphasis added) (quoting *Gallagher*, 49 F.3d at 1447).  "'While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'"  *Id.* (quoting *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158 (1978)).  Examples of functions exclusively reserved to the state include "administering elections of public officials, the operation of a company-owned town, and the management of a city park."  *Gallagher*, 49 F.3d at 1456 (citations omitted).  In contrast, cases from the Supreme Court and our Circuit identify some functions that are not exclusively reserved to the state:  running sports associations and leagues, administering insurance payments, providing nursing home care, providing special

---

[3]     The court considered both tests when plaintiffs advanced arguments against Adventist and the other OB/GYN defendants' Motion to Dismiss.  The court held Adventist and the OB/GYNs were not state actors under either test.  *See* Doc. 35 at 6–11.

education, enforcing a statutory lien by a private party, providing security at a building leased

from a state institution, furnishing utility services, representing indigent criminal defendants,

resolving private disputes, and operating public access channels on a cable system.  *Manhattan*

*Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1929 (2019) (collecting cases and holding

operating public access channels on a cable system is not a function "traditionally and

exclusively . . . performed by government"); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345,

353–54 (1974) (holding furnishing utility services is not a public function and explaining that

while many business and professions are regulated—like doctors and lawyers and utility

companies—their statuses as regulated persons or businesses does not "covert their every action,

absent more, into that of the State"); *Gallagher*, 49 F.3d at 1456–57 (collecting cases and

holding providing security at a building leased from a government entity does not convert the

actor providing pat-down searches into a state actor under the public function test because this is

not "traditionally an exclusive function of the state").

The Supreme Court has explained that "to qualify as a traditional, exclusive public

function . . . the government must have traditionally *and* exclusively performed the function."

*Halleck*, 139 S. Ct. at 1929.  And, "the fact that the government licenses . . . a private [person]

does not convert the [person] into a state actor—unless the private [person] is performing a

traditional, exclusive public function."  *Id*. at 1931.  In Part 3, following, the court considers

whether plaintiffs plausibly have alleged that defendant performed a traditional and exclusive

state function or otherwise took action attributable to the state when she terminated the CPA.

### 3.  Analysis

Plaintiffs contend that defendant, by terminating the CPA with plaintiffs, performed a

function exclusively reserved to the Kansas Legislature and KSBN because the CPA provided

plaintiffs certain rights associated with their APRN licenses that were taken away when the CPA was terminated.  Plaintiffs allege that "[t]he acts of Dr. Proverbs . . . were legislative acts . . . that deprived them of their liberty and property interests without notice, hearing, impartial decision-maker or any right or ability to appeal or seek judicial review."  Doc. 1 at 14 (Compl. ¶ 82).  Plaintiffs contend that defendant was "actively participating in Kansas' regulation of [p]laintiffs," which is a function traditionally exclusively reserved to the State.  *Id.* at 14–15 (Compl. ¶ 85).  And, they allege, defendant's actions were "coerced by state law" because plaintiffs "would have been prosecuted by KSBN if [p]laintiffs refused to comply with the termination and denial of their rights by the private actors . . . ."  *Id.* at 14 (Compl. ¶ 84) (citation and internal quotation marks omitted).

Plaintiffs' position is that the collaborative practice agreement—the CPA—is a form of license or regulation and thus defendant's actions are the equivalent of legislating or licensing plaintiffs in their profession.  *See* Doc. 42 at 2–4; *see also* Doc. 1 at 24 (Compl. ¶¶ 132–134, 136–138) (alleging defendant "willingly participated in enforcing" and "acted with the explicit authority granted through the CPA Policy" and thus "engaged in the regulation of APRNs" and acted "under color of law").  They argue that any power defendant exercised over their nursing practice was an action "exclusively reserved to a state agency:  KSBN," and was "outside her lawful authority."  Doc. 42 at 3; *see also id.* at 5 (arguing the court should "declare that regulation of professionals is an activity that has been exclusively reserved to the states").

Plaintiffs' theory that defendant engaged in "legislative acts" is tied to Kansas and KSBN's collaborative practice statutes and regulations.  Under regulations adopted by KSBN, APRNs are authorized to "make independent decisions about *advanced practice nursing* needs of families, patients, and clients."  Kan. Admin. Regs. § 60-11-101(a) (emphasis added).  APRNs

also may make "medical decisions *based on the authorization for collaborative practice with one or more physicians*." *Id.* (emphasis added).  The regulation defines "Authorization for collaborative practice" to mean "that an APRN is authorized to develop and manage the *medical* plan of care for patients or clients based upon an agreement *developed jointly* and signed by the APRN and one or more physicians." *Id.* § 60-11-101(b) (emphasis added).[4]  Under the regulations, the term "physician" is defined as "a person licensed to practice medicine and surgery by the state board of healing arts." *Id.* § 60-11-101(c).  The Kansas statutes also authorize APRNs to prescribe drugs, if they do so "*pursuant to a written protocol as authorized by a responsible physician*" who has "accepted responsibility for the protocol and the actions of the [APRN] when prescribing drugs."  Kan. Stat. Ann. § 65-1130(d) (emphasis added).  In short, Kansas law requires collaboration with a physician for an APRN to perform certain acts.

In plaintiffs' view, because a CPA is required to make medical decisions or prescribe drugs or, more specifically, have admitting privileges at SMMCH, they must have a CPA to "practic[e] [in] their chosen profession."  Doc. 1 at 5, 13, 23 (Compl. ¶¶ 22, 73, 129).  Plaintiffs argue that Kan. Admin. Regs. § 60-11-101 delegates to private physicians, their competitors, the "authority to define each, individual APRN's legal privileges."  *Id.* at 7–15 (Compl. ¶¶ 37–86).  Plaintiffs contend that the Kansas Legislature delegated authority to KSBN to enact regulations establishing the roles of APRNs "consistent with nursing practice specialties recognized by the nursing profession."[5]  *Id.* at 7–8, 11, 13 (Compl. ¶¶ 41, 42, 63, 64, 77, 79).  And, they argue, by

---

[4]    Kan. Admin. Regs. § 60-11-105 provides additional detail about the functions of APRNs, like plaintiffs, practicing as nurse-mid-wives.  It similarly provides in pertinent part that such APRNs may "develop and manage the medical plan of care for patients or clients, based on the authorization for collaborative practice."  Kan. Admin. Regs. § 60-11-105(b).

[5]    Under Kansas law, KSBN is charged with adopting standards, regulations, and professional requirements for APRNs.  Kan. Stat. Ann. § 65-1130(c)(1), (c)(3) (the board of nursing "shall adopt rules and regulations applicable to [APRNs]" that "[e]stablish roles . . . of [APRNs] which are consistent with

promulgating Kan. Admin. Regs. § 60-11-101, KSBN has further delegated legislative power to private physicians such as defendant, *i.e.*, by allowing APRNs and physicians to enter into collaborative practice agreements that expand an APRN's role.  *Id.* at 7–8, 9, 10, 12 (Compl. ¶¶ 37–42, 51, 57–59, 70).  Because of this alleged delegation of legislative power, plaintiffs assert that defendant functioned as a state legislator or exercised licensing or regulatory power over their profession when she terminated the CPA.  So, plaintiffs contend, defendant was performing a public function when she terminated the CPA and thus is a state actor. *See* Doc. 42 at 4–6. And thus, plaintiffs argue, plaintiffs were owed constitutional protections when defendant decided to collaborate with them no longer, removing any prescriptive authority or ability to make medical decisions as agreed to in the CPA.

Defendant, on the other hand, argues that she was not regulating or licensing APRNs, but merely terminated "a contract between two private parties, according to its terms."  Doc. 40 at 6. Defendant also contends that any supervisory role she exercised over plaintiffs was not a traditional and exclusive state function.  *Id.* at 6–7.  Defendant notes that plaintiffs still have Kansas APRN licenses and that their profession is regulated not only by KSBN, but they also are certified by the American Midwifery Certification Board.  *Id.* at 7–8 (citing Compl. ¶¶ 7–8). Defendant asserts that various industry organizations help determine which decisions nurses and midwives are authorized to make, and private medical facilities often set terms and conditions that health care providers practicing at their facility must follow when performing services.  So, setting limits or conditions on an APRN's practice is not a traditional state function—let alone an exclusive one.  *Id.*

---

nursing practice specialties recognized by the nursing profession" and "[d]efine the role of [APRNs] and establish limitations and restrictions on such role").

For reasons explained below, the court concludes plaintiffs have not alleged plausibly that defendant is a state actor. *First*, plaintiffs have not established that defendant's challenged action—terminating the CPA—was a traditional and exclusive state function. *Second*, defendant's termination of the CPA—the alleged action depriving plaintiffs of alleged federally protected rights—is not "'fairly attributable to the State.'" *Gallagher*, 49 F.3d at 1447 (quoting *Lugar*, 457 U.S. at 937).

### Traditional and Exclusive State Function

Plaintiffs ask the court to conclude that regulating the APRN profession is an activity traditionally and exclusively reserved to the states and that plaintiffs plausibly have alleged defendant engaged in this exclusive state function. But, they cite no cases holding regulation of APRNs is a traditional and exclusive state function similar to "administering elections of public officials, the operation of a company-owned town, and the management of a city park." *Gallagher*, 49 F.3d at 1456 (citations omitted).

Plaintiffs' Complaint cites *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974), for the proposition that regulating a profession is an exclusive state function. Doc. 1 at 14–15 (Compl. ¶ 85). But *Jackson* merely described how utilities, like doctors and lawyers, are regulated by the state and explained that performing a state-regulated function, though a service that affects the public interest, is not necessarily performing a function traditionally and exclusively reserved to the state. *Jackson*, 419 U.S. at 353–54. The Supreme Court did not analyze whether the act of regulating utilities itself was a traditional and exclusive state function. It focused instead on whether the "particular conduct" challenged—disconnecting plaintiff's utility service—was private action or state action. *Id.* at 349–51.

The *Jackson* plaintiff had argued that under a Pennsylvania statute she "had an entitlement to reasonably continuous electrical service to her home," and that defendant's termination of this service was state action. *Id.* at 347–48. The Supreme Court disagreed. *Id.* at 353–54. It explained that the Pennsylvania statute did not obligate *the state* to furnish utility services and that providing utility services is not a "state function or municipal duty" under Pennsylvania law. *Id.* So, while the private utility company was providing an essential public service, it was not exercising "powers traditionally exclusively reserved to the State," *i.e.*, performing a public function. *Id.* at 352–53. While the utility company "elected to terminate service to petitioner in a manner in which the Pennsylvania Public Utility Commission found permissible under state law," the Court held this termination was not "attributable the State for purposes of the Fourteenth Amendment." *Id.* at 358.

As in *Jackson*, the court focuses here on the action plaintiffs contend violated their constitutional rights—defendant's termination of the CPA without due process. Plaintiffs contend this was a form of legislating or licensing and regulating their profession. As explained below, under the facts alleged, the court cannot agree that defendant's decision to terminate the CPA is the equivalent of performing a traditional and exclusive public function.

Plaintiffs contend that defendant was delegated state legislative power, which may constitute a power "traditionally associated with [state] sovereignty."[6] *See Jackson*, 419 U.S. at 353 (noting if the utility company had exercised a power "traditionally associated with sovereignty, such as eminent domain" the result may be different); *cf. N.C. State Bd. of Dental Exam'rs v. F.T.C.*, 574 U.S. 494, 500–01, 504–05, 511–12 (2015) (explaining state legislation is

---

[6]     In Count I, plaintiffs claimed this alleged delegation violated the Kansas Constitution. The court declined to reach this question because Eleventh Amendment sovereign immunity barred the court's consideration of Count I's claim. *See* Doc. 38 at 16, 32–33.

"an exercise of the State's sovereign power" that is entitled to state-action immunity for antitrust claims, but holding that North Carolina's State Board of Dental Examiners, who was permitted to "promulgate rules and regulations governing the practice of dentistry within the State," was a "'public/private hybrid'" and was *not* entitled to state-action immunity for its decision that teeth whitening was the practice of dentistry because this was not a decision supervised by the state). But plaintiffs have not alleged that defendant was promulgating statutes or regulations applicable to all Kansas APRNs. Instead, they have alleged defendant was a willful participant in KSBN's collaborative practice policy, contracting with two APRNs, and then terminating the parties' CPA without due process. Doc. 1 at 23–25 (Compl. ¶¶ 128–142). Plaintiffs must show that this decision—terminating the CPA—was the equivalent of a public function and attributable to the state. Plaintiffs' challenge to this decision does not plausibly allege that defendant exercised legislative power.

Also, plaintiffs contend the CPA was a form of license or regulation because plaintiffs could make certain decisions only if a CPA authorizing them was in place. They argue licensing and regulating a profession are traditional and exclusive state functions, so when defendant terminated the CPA she performed a public function. Plaintiffs cite *Shume v. Pearson Education, Inc.*, 306 F. Supp. 3d 117 (D.D.C. 2018), to support their theory that defendant held some of the state's power to license plaintiffs in their profession and thus performed a public function. *Id.* at 126–27 (explaining issuing or withholding a state license to practice a profession is a "traditional government function").

In *Shume*, the plaintiff was granted a Nurse Aide Certificate by the District of Columbia Department of Health. *Id.* at 122. The plaintiff's certificate had been renewed three times, but when the plaintiff submitted her fourth renewal application to Pearson Education—who the

plaintiff alleged had contracted with the District of Columbia to provide testing services and handle certification decisions—Pearson Education declined to renew the certificate. *Id.* It explained that plaintiff had not passed a Nurse Aide Practice Exam. *Id.* The plaintiff sued both Pearson Education and the District of Columbia for failing to renew her Nurse Aide Certificate. *Id.* at 123. She asserted a § 1983 claim alleging the defendants "violated her right to due process by revoking her certificate without a pre- or post-deprivation hearing or other adequate safeguards." *Id.* Pearson Education moved to dismiss the § 1983 claim for failure to state a claim, arguing it was not a state actor. *Id.* at 126. But the court denied Pearson Education's motion. *Id.* at 126–27.

The court explained that a testing company like Pearson Education generally is not a state actor if it "merely administer[s] tests and report[s] the results." *Id.* at 126. But, when a testing company is "directly involved in the licensing process, for example by having the power to revoke or issue licenses," it engages in a "traditional government function" and becomes a state actor. *Id.* And, because the plaintiff had alleged that Pearson Education decided whether to renew her certification, the court concluded plaintiff plausibly had alleged that "the District of Columbia delegated to Pearson some of its power to license applicants and to decide what procedures to afford them." *Id.* at 127. So, the District of Columbia court held, Pearson Education could be treated as the District of Columbia's "agent" and a state actor. *Id.*

Here, plaintiffs argue that the CPA gave defendant the power to "grant or deny Plaintiffs the authority to practice medicine," and the CPA was a means of Kansas delegating to defendant the ability to decide the scope of plaintiffs' "legal authority to practice." Doc. 42 at 4–5. Defendant's role thus equated to Pearson Education's role in *Shume*. *Id.* They contend defendant was involved in Kansas's regulation or licensing of APRNs, and thus is a state actor.

*Id.* But this argument overlooks an important difference.  Unlike the plaintiff in *Shume*, plaintiffs allege that they remain Kansas licensed APRNs even without the CPA.  *See* Doc. 1 at 3 (Compl. ¶ 7–8).  And, they never allege defendant was in the business of establishing requirements for APRN licensure and practice for all APRNs in Kansas.  They allege only that they reached an agreement to collaborate with defendant, and then defendant terminated that agreement.  *Id.* at 5 (Compl. ¶¶ 23–24).

Indeed, in *Shume*, the plaintiff plausibly had alleged that without the certificate she could no longer work as a nurse aid anywhere in the District of Columbia.  *Shume*, 306 F. Supp. 3d at 128.  But here, plaintiffs never allege that defendant exercised authority to approve or revoke plaintiffs' APRN licenses or otherwise took any action against those licenses.  Plaintiffs also do not allege defendant prevented them from practicing as APRNs in Kansas or prevented them from seeking a CPA with another physician.  Instead, they allege that they entered into a CPA with defendant granting them certain privileges and that defendant later terminated that contractual agreement.  While the CPA established the terms of plaintiffs' working relationship with this particular physician, the allegations—even when viewed in the light most favorable to plaintiffs—do not plausibly allege that defendant set licensing standards for APRNs or controlled plaintiffs' ability to practice as APRNs in Kansas.  Thus, the Complaint does not plausibly allege that defendant performed a public function on behalf of the state when she terminated the CPA.  Instead, the allegations show plaintiffs entered into a private business relationship with defendant, agreed to by contract within the confines of the laws applicable to their respective licenses, and defendant ended that relationship.  *Cf. Morta v. Korea Ins. Corp.*, 840 F.2d 1452,

1460 (9th Cir. 1988) ("[P]eople have the right, within the scope of what is lawful, to fix their

legal relationships by private agreement . . . .").[7]

 Plaintiffs have failed to direct the court to any law convincing the court that reaching an

agreement that allows APRNs to perform certain medical acts only while a CPA with a licensed

physician is in place is a traditional and exclusive state function—let alone that a decision to

terminate such a contract is a traditional and exclusive state function.  *Cf. N.C. State Bd. of*

---

[7] In their Complaint, plaintiffs complain about KSBN's collaborative practice regulation delegating authority to physicians and about defendant's termination of the CPA without due process.  But they never complain about the terms of the CPA itself.  In their Response to defendant's motion, plaintiffs cite the CPA (which was attached to defendant's Answer) to support their argument that defendant used the CPA to define plaintiffs' ability to practice nursing and thereby exceeded the scope of what the KSBN regulation intended.  Doc. 42 at 1–5.  Plaintiffs contend defendant "acted in a role that she knew was exclusively reserved to a state agency" and "purported to define [p]laintiffs' rights to practice nursing." *Id.* at 3.  Because plaintiffs cite the CPA, the court has reviewed it.  *Cf. Kastner v. Guenther*, No. 10-1013-EFM, 2010 WL 4624037, at *1 n.2 (D. Kan. Nov. 5, 2010) ("Notwithstanding the general principle that the [c]ourt should not consider matters outside the complaint without converting a . . . motion for judgment on the pleadings to a motion for summary judgment, 'if a plaintiff does not incorporate or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered . . . .'" (quoting *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1382 (10th Cir. 1997))).  But, the court isn't persuaded by this argument in plaintiffs' Response that the terms of the CPA show defendant was engaging in a public function when she terminated that agreement.

 Plaintiffs never explain which portion of the CPA allegedly defined plaintiffs' right to practice nursing.  The very CPA that plaintiffs reference explicitly states, "Physician, APRN and the State of Kansas, recognize that APRN has independent professional authority . . . to engage in those acts consistent with APRNs specialized knowledge, judgment, skill, training and education."  Doc. 10-1 at 2 (citing the Kansas regulations).  It goes on to explain that the APRN will collaborate with the physician when the "care falls outside of the scope of such experience."  *Id.*  The parties agreed the "physician and APRN shall consult with each other . . . as needed" and the "APRN shall refer patients who are outside of the agreed scope of practice to the qualified physician . . . ."  *Id.*  It lists services the APRN is anticipated to provide, but the list is not all inclusive.  *Id.*  And, defendant agreed to delegate prescriptive authority, subject to guidelines for care established.  *Id.*  Finally, it explains that "either party" can give 90 days' notice to terminate the CPA.  *Id.* at 3.  The CPA appears to align with the Kansas statutes and regulations and the limits and restrictions imposed on an APRN's role by KSBN and the Kansas Legislature.  Also, plaintiffs never explain what source or authority prohibits a licensed physician and licensed APRN from agreeing to define the scope of their working relationship by contract.

 Regardless, plaintiffs' § 1983 claim must allege defendant deprived them of constitutionally protected rights under color of state law.  And, they allege in the Complaint defendant has done so by terminating the CPA.  The court does not see how the terms of the CPA make defendant's decision to terminate that agreement a public function and attributable to the state.

*Dental Exam'rs*, 574 U.S. at 512–13, 515 (explaining that "there is a strong tradition of professional self-regulation" in the United States, particularly in fields like law, medicine, and dentistry and holding that where state delegated regulation of dentistry to a State Board of Dentistry that included "active market participants as regulators" the Board was *not* entitled to state-action immunity unless the state provided active supervision to the Board's challenged decision); *McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519, 525 (3d Cir. 1994) (explaining that "[t]he evaluation and accreditation of medical education in this country is neither a traditional nor exclusive state function," and even though the Pennsylvania State Board of Medicine "has taken on the function of approving Pennsylvania residency programs under the Act, 'that legislative policy choice in no way makes these services the exclusive province of the State'" (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982)). Nor have plaintiffs explained how defendant's decision to terminate the CPA is attributable to the state, particularly where plaintiffs' Kansas APRN licenses remain intact and the parties' agreement affected only their collaborating relationship. *Cf. McKeesport Hosp*, 24 F.3d at 523–26 (holding accreditation council's withdrawal of accreditation for hospital's general surgery residency program was not state action despite Pennsylvania statutes requiring medical facilities to meet requirements set by the Pennsylvania State Board of Medicine or any accrediting body recognized by the Board because the "Board remains ultimately responsible for approving medical training facilities in Pennsylvania").

In *Johnson v. Rodrigues*, the Tenth Circuit held an adoption center and adoptive parents were private parties and not state actors under the public function test because they were not the "'exclusive means to adopt children in Utah.'" 293 F.3d at 1203 (noting other adoption agencies were available to plaintiff). Likewise, plaintiffs here had the option to pursue CPAs with other

physicians under terms mutually agreed upon in a contract.  Plaintiffs never explain how losing a

CPA with one particular physician—though it terminated their contractual agreement with a

physician employed at SMMCH and ended their associated privileges—stripped them of their

APRN licenses or their "right to practic[e] [in] their chosen profession."  Doc. 1 at 15 (Compl. ¶

87).  Plaintiffs do allege that a CPA was required to practice in the manner they desired—*i.e.*, in

a manner that allows them to attend births at SMMCH with whatever prescriptive authority or

ability to make medical decisions agreed to in the CPA with defendant.  But, plaintiffs never

allege plausibly that their nursing licenses are at risk, that they were deprived entirely of their

ability to practice as APRNs in Kansas without a CPA, or that they were deprived of their ability

to enter into a CPA with other physicians when their existing agreement ended.[8]  Instead, as the

court has previously explained, plaintiffs remain free to practice independently, seek

employment in Kansas as licensed APRNs, or form a collaborative practice agreement with

another physician.  Doc. 35 at 8; Doc. 38 at 43; Doc. 45 at 8–9.[9]

---

[8]        Plaintiffs' Response contends that when they filed this case, they "understood that the [CPA]
defined the totality of [p]laintiffs' privileges to practice nursing and/or medicine" and did not believe that
they had any independent authorization "to practice nursing under their state licenses."  Doc. 42 at 1.  As
the court previously explained, this allegation that they must collaborate with a physician for their APRN
licenses to remain valid is not supported by the applicable law.  *See* Doc. 38 at 3, 24–25, 38–39
(explaining that the collaborative practice regulation is permissive—expanding an APRNs role if in place,
but the APRN license remains intact with or without a CPA); Doc. 45 at 7–10 (explaining the court never
held that a CPA is required to be an APRN or that plaintiffs' APRN licenses somehow were invalidated
when defendant terminated the CPA).  And, the court has held that requiring a CPA to exist for an APRN
to perform certain acts furthers a legitimate state interest in protecting the health and welfare of the public
and ensuring qualified providers are performing patient care.  Doc. 38 at 39, 41.

[9]        Plaintiffs' allegations that they remain licensed APRNs support defendant's second argument for
dismissal—no one deprived them of a constitutionally protected right.  In *Shume*, the District of Columbia
did not dispute the plaintiff's "allegation that she had a liberty interest in her right to work as a nurse aid."
*Shume*, 306 F. Supp. 3d at 127.  Because the plaintiff had alleged plausibly that "without the required
certificate, [plaintiff] is unable to continue to pursue her chosen profession as a nurse aid in the District of
Columbia" the court held the plaintiff had "plausibly allege[d] that she was deprived of a liberty interest."
*Id.* at 128.

In sum, the court holds defendant, by terminating the CPA, has not performed an action that is "the exclusive prerogative of the state," and thus is not a state actor. *Johnson*, 293 F.3d at 1203. Plaintiffs have not plausibly alleged defendant performed a traditional and exclusive state function by terminating the CPA where plaintiffs remain licensed APRNs with the ability to practice their chosen profession in Kansas and pursue CPAs with other physicians. Plaintiffs here have alleged "no exclusive state involvement" in the parties' collaboration process. *Id.* And, as explained next, though the CPA and the authorizations plaintiffs secured through it stem from Kansas statutes and regulations, this tie to Kansas law is not sufficient to connect the state to defendant's decision to terminate the CPA so that defendant's actions are "attributable to the state for purposes of the Fourteenth Amendment." *Jackson*, 419 U.S. at 358.

### State Involvement in the Decision to Terminate the CPA

Under any test used to determine if a private defendant is a state actor for a § 1983 claim, the challenged action must be "'fairly attributable to the State.'" *Gallaher*, 49 F.3d at 1447 (quoting *Lugar*, 457 U.S. at 937). And, to determine if state action is present, the court must focus on the challenged action and determine if the state exerted "influence or control over those decisions." *Gilmore v. Salt Lake Cmty. Action Program*, 710 F.2d 632, 635–36 (10th Cir. 1983). "[G]overnmental funding and regulation" alone is "insufficient to establish governmental action." *Id.* at 636; *see also Gallagher*, 49 F.3d at 1447 (applying the nexus test and explaining

---

Here, while termination of the CPA meant plaintiffs no longer held admitting privileges at SMMCH or certain privileges like prescriptive authority or the ability to develop a medical plan of care, plaintiffs remained free to pursue a CPA with another physician and their APRN licenses remained intact. "A protectable right is not simply something that a person professes to have an abstract need or desire to acquire. Instead, a person has a protectable liberty or property right when he has a legitimate claim of entitlement to something . . . ." *Heath v. Norwood*, 325 F. Supp. 3d 1183, 1191 (D. Kan. 2018) (citations and internal quotations marks omitted); *cf. Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 575 (1972) ("It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another.").

"the existence of governmental regulations" or government approval of a private party's actions are "not sufficient to justify holding the State responsible" for those acts "under the terms of the Fourteenth Amendment" (citations and internal quotation marks omitted)).  The challenged party have exercised "government power" for the party to become "subject to constitutional constraints." *Gilmore*, 710 F.2d at 636, 638–39 (holding decision to discharge plaintiff from a community action agency (which could be qualify as a state actor) was made by a private employee without reference to state standards or rules, so the nexus test was not satisfied).

As explained above, plaintiffs did not allege plausibly that defendant's decision to terminate the CPA was the equivalent of legislating rules for Kansas APRNs or revoking plaintiffs' licenses to practice as APRNs in Kansas.  Defendant was not performing a traditional and exclusive state function when she decided to terminate the contract with plaintiffs.  Now, the court considers if defendant was exercising "government power" by terminating the CPA merely because the Kansas statutes and regulations provide for these collaborative practice agreements. The court holds she was not.  Below, it explains why.

The Kansas statutes and regulations permit CPAs by joint agreement, but neither physicians nor APRNs are required to enter a CPA.  *See* Kan. Stat. Ann. § 65-1130(d) (explaining APRNs "may prescribe drugs" under a written protocol that was authorized by a physician); Kan. Admin. Regs. § 60-11-101(a)-(b) (authorizing APRNs to make independent nursing decisions and, if based on a CPA "developed jointly" with a physician, authorizing APRNs to make medical decisions).  Because the state did not require the CPA or command its termination, the mere fact that the CPA was authorized under the Kansas statutes and regulations does not convert defendant's action terminating the CPA into state action.  *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 164–66 (1978) ("[A] State's mere acquiescence in a private action [does

not] covert[] that action into that of the State."); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163,

175–77 (1972) (holding fact that private club held state issued liquor license and was regulated

by the Pennsylvania Liquor Control Board does not amount to state involvement in club's

activities significant enough to make the club a state actor when it engaged in racial

discrimination); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 170–71 (1970) (explaining if a state

law commands or compels a person to take action that results in a Fourteenth Amendment

violation, the person's action could be considered state action); *Scott v. Hern*, 216 F.3d 897, 906

(10th Cir. 2000) (explaining that "[a] private individual does not engage in state action simply by

availing herself of a state procedure," even if the person is a licensed physician, where his action

does not "lend the weight of the State to his decisions" (citations and internal quotation marks

omitted)).[10]

    For example, in *Wittner v. Banner Health*, plaintiffs argued a medical facility and the

physician and nurse it employed were state actors because the actions they took were authorized

by Colorado law, which allowed 72-hour involuntary mental health holds.  720 F.3d at 774.  The

Tenth Circuit disagreed.  *Id.* at 775.  Applying the nexus test, the Circuit explained that a private

hospital and its staff are "not transformed into state actors simply because they had acted in ways

the law allowed them to."  *Id.*  They could have been considered state actors whose actions were

attributable to the state only if the state had mandated the action, in essence making the state

responsible for the doctor's decision.  *Id.* at 775–76.  The Circuit next applied the public function

---

[10]     Plaintiffs contend they operated under the belief that a CPA was required to practice as a licensed
APRN in Kansas.  *See supra* note 8; *see also* Doc. 42 at 9.  For this reason, plaintiffs argue, the CPA was
not a negotiated agreement but, instead, it represented their only option or they would "face possible
criminal prosecution and jail time if the[y] continued to earn a living."  *Id.* at 11.  This mistaken belief is
not supported by any applicable Kansas law.  *See supra* note 8; Kan. Admin. Regs. § 60-11-101(a), (c)
(authorizing APRNs to make independent nursing decisions and explaining collaborative practice
agreements should be jointly developed by the APRN and physician).  Regardless, no law required
defendant to agree to a CPA with plaintiffs nor was she compelled by the state of Kansas to terminate it.

test and held a decision to involuntarily commit a mentally ill person was not an exclusive public

function. *Id.* at 777.  The Circuit also applied the joint action test, holding that though the

physician's decision to medicate the patient may be an action taken with the approval or

acquiesce of the state (because state law allowed the involuntary hold), mere approval or

acquiesce does not amount to the state conspiring with or acting jointly with the private person

and thus is not state action.  *Id.*  Finally, the Circuit applied the symbiotic relationship test.  *Id.* at

777–79.  Because the state lacked authority to place patients at the hospital and merely

authorized the hospital "to accept such patients if [it] so chooses," the Circuit held a symbiotic

relationship didn't exist.  *Id.* at 779.  The Circuit explained that the hospital may be heavily

regulated and may have elected to engage in an action that was permitted under state law.  *Id.*

But these qualities were not sufficient to connect the hospital's actions with the state such that its

actions were attributable to the state.  *Id.*

Similarly here, where a physician and two APRNs collaborated to provide patient care

within the statutory and regulatory provisions that govern their respective licenses and the

physician then terminated that relationship, defendant was not performing a function traditionally

and exclusively reserved to the state or engaging any other form of state action.  Kansas law

permits physicians and APRNs to collaborate if they so choose.  But the state did not have

sufficient control over defendant's actions for her decision to constitute state action.  The action

challenged here—termination of the CPA—is more like a personnel decision or termination of a

private contract between two private parties.[11]  Defendant ended a contractual relationship to

collaborate to provide health care and this decision was not action taken under color of state law.

---

[11]     The court previously has explained that a decision not to enter into a CPA does not amount to
state action, but is within a private parties' freedom to contract or not to contract.  *See* Doc. 35 at 6–9;
Doc. 45 at 12–17.

*See Blum v. Yaretsky*, 457 U.S. 991, 1003–12 (1982) (holding decisions to transfer patients to lower levels of care or discharge patients without advance notice or a pre-transfer hearing did not constitute state action because providing nursing home services is not a traditional and exclusive state function and the decisions were "medical judgments made by private parties according to professional standards that are not established by the State");[12] *Rendell-Baker*, 457 U.S. at 833–34, 839–43 (holding private school did not act under color of state law when it discharged employees, including employee who was hired under a federal grant and whose hiring was approved by a state committee, because the state did not have control over the school's personnel decisions to discharge employees);[13] *Benjamin v. Aroostook Med. Ctr.*, 937 F. Supp. 957, 971 (D. Me. 1996) (holding hospital who denied doctor hospital privileges was not state actor under public function test because health care services are not "an exclusive or traditional government function").

While a CPA is authorized by Kansas regulation, defendant is not transformed into a state actor merely by entering into and then terminating an agreement that the law permitted.  *See Wittner*, 720 F.3d at 775, 777.  And with "no substantial allegations that the [state] exercised any meaningful influence or control over [defendant's] challenged personnel decision[]" or, here, contractual decision, the court concludes state action did not occur.  *Gilmore*, 710 F.2d at 636; *see also id.* at 638–39 (noting that even where an entity is a state actor the alleged deprivation

---

[12]     In *Blum*, even though the nursing homes were licensed facilities subject to various state statutes and regulations, received state funding, and the state responded to the physicians' decisions by adjusting patients' Medicaid benefits, the Supreme Court concluded no state action existed because the challenged patient care decisions were not fairly attributable to the state.  457 U.S. at 1003–12.

[13]     In *Rendell-Baker*, the Supreme Court recognized the school received public funding and was publicly regulated, but it explained that educating children, though a public function, is not within the "exclusive province of the State" and that the challenged personnel decisions were not fairly attributable to the state.  457 U.S. at 833–34, 839–43.

must constitute state action and holding plaintiff had not shown his termination from

employment without due process "was in some sense attributable to a governmental decision" or

"in any way reflected a governmental policy or decision" and thus no state action existed).

In sum, defendant cannot fairly be said to be a state actor here.  Plaintiffs'

characterization of defendant's act as a legislative function or regulation of plaintiffs' ability to

practice as licensed APRNs in Kansas is too broad to fit the public function test.  While Kansas

law permits a physician and APRN to enter into a CPA establishing procedures to care for

patients in line with the scope of authority granted by virtue of their respective licenses,

defendant's decision to terminate that agreement cannot be characterized as a traditional and

exclusive state function or otherwise attributed to the state.  Plaintiffs have failed to meet their

burden to establish that defendant's actions rose to the level of state action.  The court concludes

plaintiffs have failed to allege plausibly that defendant, a private party, should be deemed a state

actor for the § 1983 claim.  And the court thus grants defendant judgment on the pleadings on the

§ 1983 claim.[14]

---

[14]     Plaintiffs' Response to defendant's Motion for Judgment on the Pleadings states that, if the court concludes defendant is not a state actor—as the court now has concluded—"then the [c]ourt should grant [p]laintiffs leave to file an amended petition against Dr. Proverbs for violations of the Sherman Anti-Trust Act."  Doc. 42 at 5; *see also id.* at 9–11 (arguing Dr. Proverbs' actions violated § 1983 and also violated the federal antitrust statutes).  Plaintiffs explain that an antitrust claim would allege that defendant's "actions [are] part of a more sophisticated version of an old, known antitrust violation:  hospitals refusing to deal with providers that physicians refuse to deal with."  *Id.* at 5.  This argument is premised on Dr. Proverbs being a competitor of plaintiffs and engaging in anti-competitive behavior by no longer collaborating with them.  *Id.* at 10.

    But, plaintiffs have not formally moved to amend as our court's local rules require.  *See* D. Kan. Rule 15.1(a).  And generally, "a court need not grant leave to amend when a party fails to file a formal motion."  *Calderon v. Kan. Dep't of Social and Rehab. Servs.*, 181 F.3d 1180, 1186–87 (10th Cir. 1999) (explaining "a request for leave to amend must give adequate notice to the district court and to the opposing party of the basis of the proposed amendment before the court is required to recognize that a motion for leave to amend is before it" and noting the Circuit has held an informal request to amend made in a response to a motion to dismiss was insufficient); *see also Albers v. Bd. of Cty. Comm'rs of Jefferson Cty., Colo.*, 771 F.3d 697, 706 (10th Cir. 2014) (holding request to amend in response to motion to dismiss that was unsupported by argument or a proposed amended complaint "was insufficient to notify

## B.       State Law Claims

Next, the court turns to plaintiffs' state law claims.  Under 28 U.S.C. § 1367(c)(3), the court may decline to exercise supplemental jurisdiction over state law claims if it has "dismissed all claims over which it has original jurisdiction."  The decision whether to exercise supplemental jurisdiction is one committed to a district court's sound discretion.  *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138–39 (10th Cir. 2004).  Section 1367 "reflects the understanding that, when deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'"  *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172–73 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Carnegie-Mellon Univ.*, 484 U.S. at 350 n.7; *see also Tonkovich v. Kan. Bd. of Regents*, 254 F.3d 941, 945 (10th Cir. 2001) (holding that where pretrial proceedings and discovery have not commenced in earnest, "considerations of judicial economy, convenience, and fairness do not favor retaining jurisdiction" (citations and internal quotation

---

the court and opposing counsel of the grounds for amendment"); *Bangerter v. Roach*, 467 F. App'x 787, 789 (10th Cir. 2012) (holding request for leave to amend raised in opposition to a motion to dismiss was insufficient).  Here, plaintiffs' Response asserts that the court should allow them to amend their Complaint to add a new claim if their § 1983 arguments fail, but it is not accompanied by any statement of the grounds for amendment or a proposed amended complaint in accordance with D. Kan. Rule 15.1 or with Fed. R. Civ. P. 15(a)(2) (requiring leave of the court to amend not as a matter of course) and Fed. R. Civ. P. 7(b) (requiring requests for a court order to be made by motion).  *See Calderon*, 181 F.3d at 1187 (holding request made in memorandum opposing motion to dismiss for leave to cure any pleading deficiencies "did not rise to the level of a motion for leave to amend" and "district court did not abuse its discretion in failing to address" the request).  The court thus declines to consider plaintiffs' informal request for leave to amend.

marks omitted)).  Also, "[n]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary."  *Thatcher Enters. v. Cache Cty. Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990).

Though defendant also argues plaintiffs' state law claims fail to state claims upon which relief can be granted, the court declines to consider those arguments.  Here, the court has dismissed every claim against defendant which it had original jurisdiction to decide.  And, the court concludes, judicial economy, convenience, fairness, and comity weigh against the court exercising supplemental jurisdiction over plaintiffs' state law claims.

*First*, dismissing plaintiffs' state law claims without prejudice will not waste judicial resources because no pretrial proceedings or discovery have taken place.  *Second*, this result is not unfair for plaintiffs.  Federal law and the Kansas "savings statute" toll the statute of limitations for plaintiffs' state law claims while they are pending in federal court and for six months afterwards.  *See* 28 U.S.C. § 1367(d) (explaining that the limitations period is tolled "while the claim is pending and for a period of 30 days after it is dismissed *unless State law provides for a longer tolling period*" (emphasis added)); *see also* Kan. Stat. Ann. § 60-518 (providing a plaintiff six months to commence a new action if a previous timely action failed "otherwise than upon the merits"); *Rogers v. Williams, Larson, Voss, Strobel & Estes*, 777 P.2d 836, 839 (Kan. 1989) (explaining that a dismissal "otherwise than upon the merits" as used in the Kansas "saving statute" includes a dismissal without prejudice).  So, nothing prevents plaintiffs from refiling their state law claims in Kansas state court, as long as they timely file the claim under the Kansas saving statute.  *Third*, the Kansas state courts provide the same level of convenience and fairness as the federal courts.  *Finally*, Kansas state courts have a strong interest in deciding matters involving purely state law claims—like plaintiffs' remaining claims asserted

28

here.  *Brooks v. Gaenzle*, 614 F.3d 1213, 1230 (10th Cir. 2010) ("'[N]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary.'" (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995))).

Because all four factors favor declining supplemental jurisdiction, and no circumstance presents a compelling reason to the contrary, the court declines to exercise supplemental jurisdiction over plaintiffs' remaining state law claims.  The court thus exercises its discretion and dismisses plaintiffs' state law claims without prejudice.  *See Brooks*, 614 F.3d at 1230 (instructing the district court to dismiss state law claims without prejudice after declining to exercise jurisdiction over state law claims).

IV.      **Court's Dismissal of State Law Claims Against Other Defendants**

The court concludes its work in this case with a brief return to one of its earlier decisions.

Previously, the court declined to exercise supplemental jurisdiction over plaintiffs' state law claims against defendant Adventist and the other OB/GYN defendants for two reasons:  (1) because the court dismissed the only federal law claim against them (§ 1367(c)(3)—"the district court has dismissed all claims over which it has original jurisdiction") and (2)  because plaintiffs' state law claims raised novel issues of state law (§ 1367(c)(1)—"the claim raises a novel or complex issue of State law").  Doc. 35 at 12–13, 13 n.3.  The court's reasoning in that Order applies to the claims against defendant Dr. Proverbs as well.  But, as explained below, the court's reliance on § 1367(c)(3) in that earlier Order may have been premature.  In any event, the court now can rely on § 1367(c)(3) to reach the same conclusion.

The case law in our district is not settled whether the phrase "all claims" in § 1367(c)(3) means the court has discretion to decline jurisdiction over supplemental claims only after the court has dismissed all claims over which it had original jurisdiction against *all* defendants or,

instead, if the court may apply § 1367(c)(3) on a party-by-party basis and decline supplemental jurisdiction over supplemental claims against a particular defendant once it has dismissed all claims over which the court had original jurisdiction against that particular defendant. *Compare Sparks v. Reno Cty. Sheriff's Dep't*, No. 04-3034-JWL, 2004 WL 1664007, at *3 n.6 (D. Kan. July 26, 2004) (though the court had dismissed "the sole federal claim against these defendants," concluding §1367(c)(3) did not apply because the court "ha[d] not dismissed all federal claims in this action" (citing *In re Sterling Foster & Co., Inc. Sec. Litig.*, 222 F. Supp. 2d 216, 283 (E.D.N.Y. 2002) (retaining jurisdiction over state-law claims against certain defendants after the court dismissed all federal claims against them because federal claims remained against other defendants, the claims arose from a common set of facts, and the court determined retaining jurisdiction was "in the interest of judicial economy"))), *and Gudenkauf v. Stauffer Commc'ns, Inc.*, 896 F. Supp. 1082, 1084–85 (D. Kan. 1995) (Crow, J.) (concluding the court must not decline jurisdiction over related state law claims forming part of the same controversy despite no federal law claims remaining against one defendant because:  (1) federal law claims against other defendant remained and the plain language of § 1367(c)(3) indicates *all* federal law claims must be dismissed for this exception allowing a court to decline supplemental jurisdiction to apply, and (2) even if the court had discretion to dismiss the state law claim, "economy and convenience would not be served by doing so" where remaining federal law claim arose from same common nucleus of operative facts), *with Blackmon v. U.S.D. 259 Sch. Dist.*, 769 F. Supp. 2d 1267, 1276 (D. Kan. 2011) (Melgren, J.) (citing § 1367(c) and declining supplemental jurisdiction over individual capacity claims against certain defendants because "all federal claims against these employees have been dismissed," even though federal law claim remained against co-defendant school district).

The court has found no Supreme Court or Tenth Circuit cases addressing this precise question.  But Moore's Federal Practice takes the approach that § 1367(c)(3) "refers to all claims in the case, not just those claims asserted against a particular defendant."  15A James Wm. Moore, et al., *Moore's Federal Practice* § 106.66[1] (3d ed. & Supp. 2020); *cf.* 13D Charles Alan Wright & Arthur R. Miller, et al., *Federal Practice and Procedure* § 3567.3 & n.85 (3d ed. & Supp. 2020) (discussing the Circuits' varied approaches to the question whether courts *must* exercise supplemental jurisdiction any time a specific exception in subsection (c) does not apply, and explaining how § 1367(c)(3) only applies if "all of the underlying [federal] claims . . . invoking an independent basis of subject matter jurisdiction" no longer are viable).

This interpretation of § 1367(c)(3)—requiring dismissal of all original jurisdiction claims against all defendants before declining supplemental jurisdiction—makes sense when viewed against the history of § 1367.  In 1990, Congress enacted § 1367 to expand district courts' supplemental jurisdiction to include jurisdiction over additional claims involving *other parties*, in addition to supplemental jurisdiction over *other claims* between the same parties where the court had original jurisdiction over at least one of their claims.  *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 556–58 (2005) (explaining § 1367(a) overturned existing Supreme Court precedent that had held "supplemental jurisdiction over additional claims involving other parties" was not authorized merely because the court had original jurisdiction over related claims with different parties).  Section § 1367(a) provides:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).  And, the Supreme Court has explained that:

> Section 1367(a) is a broad grant of supplemental jurisdiction over other claims within the same case or controversy, as long as the action is one in which the district courts would have original jurisdiction.  The last sentence of § 1367(a) makes it clear that the grant of supplemental jurisdiction extends to claims involving . . . additional parties.

*Exxon Mobil*, 545 U.S. at 558.  So, unless an exception in subsection (b) or (c) exists, § 1367(a) provides "a broad jurisdictional grant, with no distinction drawn between pendent-claim and pendent-party cases."  *Id.* at 559.

Considering § 1367(c)(3) in this context, the court now interprets the language in § 1367(c)(3) providing "district courts may decline to exercise supplemental jurisdiction" if "the district court has dismissed *all claims over which it has original jurisdiction*" to mean all claims over which it has original jurisdiction against *all* parties (*i.e.*, all original jurisdiction claims in the case—and not just the federal claims against the particular defendants the supplemental claims are asserted against).  That said, a court still must consider whether the state law claims form part of the same case or controversy before exercising supplemental jurisdiction.  *See* 28 U.S.C. § 1367(a).

This interpretation in Moore's Federal Practice—now embraced by the court—has ample support in the case law.[15]  And, even where courts determine they may have discretion under § 1367(c)(3) to decline supplemental jurisdiction on a party-by-party basis, courts generally retain jurisdiction where the state law claims are so related to the remaining federal law claims

---

[15]     *See, e.g.*, *Hansen v. Bd. of Tr. of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 607–08 (7th Cir. 2008); *Smith v. Iverson*, No. 8:19CV298, 2019 WL 4417548, at *16–17 (D. Neb. Sept. 16, 2019); *Oladokun v. Ryan*, No. 06 cv 2330(KMW), 2011 WL 4471882, at *10–11 (S.D.N.Y. Sept. 27, 2011); *Allen v. CGI Mgmt., Inc.*, No. CIV-04-1068-M, 2005 WL 2429750, at *2–3 (W.D. Okla. Sept. 30, 2005); *Medley v. Sandoval*, No. CIV 00-0534 LH/WWD, 2001 WL 37125319, at *2 (D.N.M. Jan. 9, 2001); *Besing v. France*, No. CIV 95-1193 MV/KBM, 1999 WL 35809455, at *8 (D.N.M. July 14, 1999); *Moore v. Natwest Mkts.*, No. 96 Civ. 1166 (RPP), 1996 WL 507333, at *3 (S.D.N.Y. Sept. 6, 1996); *Yeager v. Norwest Multifamily, Inc.*, 865 F. Supp. 768, 772 (M.D. Ala. 1994).

32

against other defendants that they form part of the same case or controversy, *i.e.*, it may be an abuse of discretion to dismiss those claims.[16]  Still, other courts also have endorsed the party-by-party approach previously employed in this case.[17]

In sum, and on reflection, the court may have invoked § 1367(c)(3) prematurely because, when it first invoked the provision, the court had not yet dismissed the federal law claims asserted against KSBN and Dr. Proverbs.  Given that possibility, the court returns to the scene of that conclusion and now concludes that § 1367(c)(3) is not triggered until the court has dismissed all federal claims against all defendants that form part of the same case or controversy as the state law claims, no matter which party is the target of those claims.  Regardless, with this Order, the court has now dismissed all federal claims against all defendants in this case.  So, under either interpretation of § 1367(c)(3), the court's dismissal of plaintiffs' state law claims is appropriate.  And, the court also relied on § 1367(c)(1) when it previously declined supplemental jurisdiction.  Doc. 35 at 12–13.

---

[16]      *See, e.g.*, *Prescott v. Indep. Life & Accident Ins. Co.*, 878 F. Supp. 1545, 1553 (M.D. Ala. 1995) (exercising the court's discretion and concluding it was "in the interest of judicial economy" to retain jurisdiction over state law claim against individual defendant where Title VII claim remained against defendant employer and the individual defendant's activities were part of the same case or controversy); *Wiggins v. Philip Morris, Inc.*, 853 F. Supp. 458, 469 (D.D.C. 1994) (taking the position that the court had "discretion to decline jurisdiction" under § 1367(c)(3) where all federal claims against defendant had been dismissed, despite federal law claims remaining against co-defendant, but concluding the court should retain jurisdiction because they were related to the remaining federal law claim and formed part of the same case or controversy).

[17]      *See, e.g.*, *Medlin v. City of Algood*, 355 F. Supp. 3d 707, 719 (M.D. Tenn. 2019); *T.R. v. Cty. of Del.*, No. 13-2931, 2013 WL 6210477, at *8 (E.D. Pa. Nov. 26, 2013); *Germano v. Dzurenda*, No. 3:09cv1316 (SRU), 2011 WL 1214435, at *20 (D. Conn. Mar. 28, 2011); *Lewis v. Sieminski*, No. 3:08–CV–728 (JCH), 2010 WL 3827991, at *9 (D. Conn. Sept. 22, 2010); *cf. Ryan v. Ill. Dep't of Children & Family Servs.*, 185 F.3d 751, 764 (7th Cir. 1999) (affirming district court's decision to decline supplemental jurisdiction over defamation claim against certain defendants after dismissing the federal claims against them, despite reversing district courts grant of summary judgment on federal law claims against other defendants because "there [were] no surviving federal claims against" the defendants the defamation claim was asserted against).

**V.          Conclusion**

For reasons explained, the court grants defendant's Motion for Judgment on the

Pleadings (Doc. 39).  The court concludes plaintiffs have not alleged a plausible § 1983 claim

because defendant is not a state actor.  And, the court declines to exercise jurisdiction over

plaintiffs' state law claims.  Because the court dismisses all Counts against defendant Janetta

Proverbs, M.D. with this Order, the court directs the Clerk of the Court to terminate defendant

Proverbs as a defendant in this action.  And, the court directs the Clerk to enter a judgment

consistent with this Order and its previous Orders dismissing the other defendants (Docs. 35 &

38) and close this case.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Janetta

Proverbs, M.D.'s Motion for Judgment on the Pleadings (Doc. 39) is granted for reasons

explained in this Order.

**IT IS FURTHER ORDERED THAT** having dismissed all of plaintiffs' federal claims,

the court declines to exercise supplemental jurisdiction over plaintiffs' state law claims.

**IT IS FURTHER ORDERED THAT** the Clerk of the Court is directed to terminate

defendant Janetta Proverbs, M.D. as a defendant in this action.

**IT IS FURTHER ORDERED THAT** the court directs the Clerk of the Court to enter a

judgment consistent with this Order and its previous Orders dismissing the other defendants

(Docs. 35 & 38) and close this case.

**IT IS SO ORDERED.**

**Dated this 28th day of May, 2020, at Kansas City, Kansas.**

                                        **s/ Daniel D. Crabtree**
                                        **Daniel D. Crabtree**
                                        **United States District Judge**

34